**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| TIMOTHY MCKIMMY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 4:22-CV-00545** |
| | § | |
| OPENSEA, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**DEFENDANT OPENSEA'S MOTION TO COMPEL**
**ARBITRATION AND DISMISS PLAINTIFF'S COMPLAINT**

Of Counsel:
Eric Ball (admitted *pro hac vice*)
Cal. Bar No. 241327
801 California Street
Mountain View, CA 94041
Tel.: (650) 988-8500
Fax: (650) 938-5200
eball@fenwick.com

Molly R. Melcher (admitted *pro hac vice*)
Cal. Bar No. 272950
555 California Street, 12th Floor
San Francisco, CA 94104
Tel.: (415) 875-2300
Fax: (415) 281-1350
mmelcher@fenwick.com

Geoffrey R. Miller
Tex. Bar No. 24094847
S.D. Tex. Bar No. 3365078
FENWICK & WEST LLP
902 Broadway, Suite 14
New York, NY 10010
Tel.: (212) 430-2600
Fax: (650) 988-8500
gmiller@fenwick.com

/s/ Rodger R. Cole
Rodger R. Cole (admitted *pro hac vice*)
Cal. Bar No. 178865
801 California Street
Mountain View, CA 94041
Tel.: (650) 988-8500
Fax: (650) 938-5200
rcole@fenwick.com

*Attorney-in-Charge for Defendant OpenSea*

## TABLE OF CONTENTS

I.      INTRODUCTION...................................................................................................... 1

II.     BACKGROUND ....................................................................................................... 1

     A.      OpenSea's Arbitration Agreements Governing This Action ................................. 1

     B.      Plaintiff's Repeated Acceptance of OpenSea's Terms of Service and Arbitration
           Agreements ......................................................................................................... 3

     C.      Plaintiff's Claims Against OpenSea and Refusal to Arbitrate............................. 7

III.    LEGAL STANDARD ............................................................................................... 8

IV.     PLAINTIFF AGREED TO ARBITRATE ALL CLAIMS AGAINST OPENSEA.... 8

     A.      The Federal Arbitration Act Governs the Arbitration Agreements. ...................... 8

     B.      Plaintiff Agreed to Arbitrate with OpenSea........................................................ 9

     C.      The Arbitration Agreements Delegate Gateway Questions to the Arbitrator....... 12

     D.      Plaintiff's Claims Fall Squarely Within the Scope of the Arbitration Agreements
           and the Agreements Are Enforceable. ................................................................ 14

           1.      The Arbitration Agreements encompass this dispute. ............................. 14

           2.      The Arbitration Agreements are not unconscionable. ............................. 15

V.      CONCLUSION ....................................................................................................... 18

## I.    INTRODUCTION

The proper forum for this dispute is arbitration.  Plaintiff Timothy McKimmy repeatedly and unambiguously agreed to OpenSea's Terms of Service through at least three different acceptance flows:  when purchasing his first non-fungible token using OpenSea's services, when connecting his crypto wallets to OpenSea, and when using OpenSea's mobile application.  These Terms of Service require the parties to resolve any disputes through arbitration before Judicial Arbitration and Mediation Services ("JAMS") and clearly and unmistakably delegate questions of arbitrability to the JAMS arbitrator.  Under both the plain language of OpenSea's Terms and the Federal Arbitration Act's policy favoring arbitration, this dispute belongs in arbitration. Because Plaintiff's claims are all subject to arbitration, OpenSea respectfully requests that the Court grant its motion to compel arbitration and dismiss this action in its entirety.

## II.    BACKGROUND

### A.    OpenSea's Arbitration Agreements Governing This Action

Defendant OpenSea,[1] a company headquartered in New York, provides several services to its users, such as the ability to explore non-fungible tokens ("NFTs") on supported blockchains and the opportunity to connect with other users in order to purchase or sell NFTs directly in peer-to-peer transactions.  Declaration of Ian L. Meader ("Meader Decl.") ¶ 2.  Prior to buying or selling NFTs using OpenSea's services, users must first connect their third-party crypto wallets, such as MetaMask or Coinbase Wallet, to OpenSea.[2]  *Id.* ¶ 3.  When users connect their crypto wallets to and use OpenSea, users must agree to OpenSea's Terms of Service ("Terms").  *Id.*  OpenSea periodically updates its Terms.  *Id.*

---

[1]  Plaintiff filed this lawsuit against OpenSea.  The properly named defendant is Ozone Networks, Inc. d/b/a OpenSea.

[2]  A crypto wallet allows users to engage in transactions on the blockchain.  Meader Decl. ¶ 2. OpenSea is not a crypto wallet provider.  *Id.*  Rather, various third parties, for example Consensys and Coinbase, provide crypto wallet services, in their cases MetaMask and Coinbase Wallet respectively.  *Id.*

On June 1, 2021, OpenSea updated its Terms of Service.  Meader Decl. ¶ 3; Declaration of Molly R. Melcher ("Melcher Decl.") Ex. 2 ("June Terms").  The June Terms notify users upfront, in bold capital letters, that the Terms "REQUIRE DISPUTES BETWEEN US TO BE SUBMITTED TO BINDING AND FINAL ARBITRATION."  June Terms at 2, § 1.  Section 15 of the June Terms, the "Dispute Resolution; Arbitration" provision, states that users must agree to arbitrate "any dispute or claim relating in any way" to users' access of or use of OpenSea, or "any aspect of [their] relationship with" OpenSea.  *Id.* at 13, § 15(b).  Section 15 also specifies that the "[t]he Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement" and "[t]he arbitration will be conducted by JAMS."  *Id.* at 13, § 15(c). Moreover, it contains a delegation provision, which provides that the JAMS arbitrator has "exclusive authority" to determine and resolve any disputes regarding the scope, enforceability, interpretation, applicability, or formation of the arbitration agreement.  *Id.* at 14, § 15(d). Finally, the June Terms alert users that OpenSea may make future changes to the Terms and "[b]y continuing to access or use the Service, you confirm your acceptance of the revised Terms and all of the terms incorporated therein by reference."  *Id.* at 2, § 1.  Nonetheless, users can opt out of the arbitration agreement by sending written notice to OpenSea "within 30 days after first becoming subject to this Arbitration Agreement."  *Id.* at 14-15, § 15(g).

On December 31, 2021, OpenSea amended its Terms of Service.  Meader Decl. ¶ 3; Melcher Decl. Ex. 3 ("December Terms").  The December Terms remain in effect today.  *Id.* Like the June Terms, users are also notified immediately that the December Terms "INCLUDE A MANDATORY ARBITRATION AGREEMENT," which "REQUIRE ANY DISPUTES BETWEEN US TO BE RESOLVED THROUGH INDIVIDUAL ARBITRATION RATHER THAN BY A JUDGE OR JURY IN COURT."  December Terms at 1, § 1.  Section 16 of the December Terms contain the arbitration agreement, under which the parties "both agree to engage in good-faith efforts to resolve disputes prior to either party initiating an arbitration."  *Id.* at 13, § 16.  But if this informal dispute resolution is unsuccessful, "either party may commence arbitration."  *Id.* at 14, § 16.  Section 16 provides in pertinent part:

You agree that *any* dispute, controversy, or claim *relating in any way* to your access or use of the Service, or to your products sold or distributed through the Service, or to *any aspect of your relationship with OpenSea*, will be resolved by binding arbitration, rather than in court, *including threshold questions of the arbitrability of such dispute, controversy, or claim* . . . .

The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement" and that "[t]he arbitration will be conducted by JAMS." . . . .

The arbitrator shall have *exclusive authority* to (a) determine *the scope and enforceability of this Arbitration Agreement* and (b) *resolve any dispute related to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement* including, but not limited to, any claim that all or any part of this Arbitration Agreement is void or voidable . . . . The arbitrator has the same authority to award relief on an individual basis that a judge in a court of law would have. The award of the arbitrator is final and binding upon you and us.

*Id.* at 13-15, § 16 (emphases added).  The December Terms further provide that "[t]hese Terms and your access to and use of the Service shall be governed by and construed and enforced in accordance with the laws of the State of New York."  *Id.* at 15, § 17.

Both the June and December Terms contain broad arbitration agreements (collectively, "Arbitration Agreements") that are governed by the Federal Arbitration Act and both delegate threshold questions of arbitrability to the arbitrator, not the court.[3]  Nonetheless, both versions of OpenSea's Terms offer users the opportunity to reject "any future material change" made by OpenSea to the Arbitration Agreements "within thirty (30) days of such change becoming effective by writing to OpenSea."  *See* June Terms at 15, § 15(j); December Terms at 15, § 16.

### B.   Plaintiff's Repeated Acceptance of OpenSea's Terms of Service and Arbitration Agreements

Plaintiff has been a consistent and frequent OpenSea user since at least December 2021. Indeed, even after filing this lawsuit against OpenSea, he continued to purchase NFTs through OpenSea's website with the very same crypto wallet that was allegedly compromised in the transaction at issue in this case.  Meader Decl. ¶¶ 5, 10; Complaint at 10.  Throughout this period, he assented to the June Terms and December Terms numerous times, including when he

---

[3]  Both the June and December Terms incorporate JAMS's rules by reference.  *See* June Terms at 13, § 15(c); December Terms at 14, § 16.

purchased his first NFTs, connected his crypto wallets to OpenSea, and continued to use OpenSea's website and mobile app—thereby repeatedly reaffirming his agreement to arbitrate any disputes. *Id*. ¶¶ 7, 9-10, 12.

Plaintiff assented to OpenSea's June Terms via OpenSea's website at least twice. As shown in the image below, when an OpenSea user navigates to purchase an NFT for the first time using OpenSea's services, they must affirmatively check a box, indicating that they "agree to OpenSea's Terms of Service[.]"



*Id*. ¶ 6. The words "Terms of Service" are shown in blue and contain a hyperlink to OpenSea's operative Terms so users can review them before completing the purchase. *Id*. On December 3, 2021,[4] Plaintiff purchased the NFT Bored Ape Yacht Club No. 3475 ("BAYC #3475") using a crypto wallet associated with his OpenSea account associated with the username tjmckimmy.[5] *Id*. ¶ 7, n.3. Prior to completing the purchase of BAYC #3475, Plaintiff had to assent to the June Terms by affirmatively checking the box described above. *Id*. Later, on December 18, 2021, Plaintiff used another crypto wallet associated with his "dextermoonshine"[6] OpenSea account to

---

[4] Dates and times relating to Plaintiff's activity using OpenSea are based on the UTC.

[5] Plaintiff later transferred this NFT from this crypto wallet to the wallet that was allegedly compromised.

[6] The username associated with this account was later changed to "timothymckimmy" after Plaintiff brought this lawsuit. Meader Decl. ¶ 5.

purchase another NFT using OpenSea's services and again assented to the June Terms by checking the box described above.  *Id.*

Plaintiff also repeatedly assented to both the June Terms and December Terms when he used OpenSea's services after connecting his crypto wallets to OpenSea.  When an OpenSea user meaningfully interacts with the website by taking an action other than browsing (e.g., attempting to access their profile info), they receive a notification from OpenSea directing them to connect their crypto wallet.  Meader Decl. ¶ 8.  After the user selects their relevant crypto wallet (e.g., MetaMask), the user will see a pop-up authentication request,[7] like the one below:



*Id.* ¶ 8.  The pop-up window notifies users that when they "Click to sign in," they thereby "accept the OpenSea Terms of Service[.]"  *Id.*  The pop-up window also provides a URL to OpenSea's Terms, offering users an opportunity to review them each time before they sign in.

---

[7]  Plaintiff used a MetaMask wallet to connect both of his crypto wallets to OpenSea.  Meader Decl. ¶ 8 n.4.  He also used Coinbase Wallet to connect his crypto wallet associated with the tjmckimmy username.  The pop-ups for both MetaMask and Coinbase wallets contain the same language (illustrated above) prompting users to "Click to sign in and accept the OpenSea Terms of Service," provides a URL to the OpenSea Terms, and requires OpenSea users to select "Sign" before proceeding.  *Id.*

*Id.*  If a user attempts to meaningfully interact with OpenSea's website after 24 hours has elapsed since they last connected their crypto wallet to OpenSea, they must re-connect their crypto wallet to OpenSea and will receive the pop-up authentication request again, requiring them to re-assent to the Terms.  *Id.*

Plaintiff assented to OpenSea's December Terms in this manner numerous times since they went into effect on December 31, 2021.  *Id.* ¶¶ 9-10.  For example, Plaintiff bought three NFTs using OpenSea's services on February 2, 2022, February 15, 2022, and March 2, 2022 (12 days *after* the Complaint was filed) using his dextermoonshine crypto wallet, the same crypto wallet that the Complaint alleges was compromised.  *Id.* ¶¶ 5, 10.  Likewise, on March 30, 2022, more than a month after filing the Complaint, Plaintiff bought an NFT using his tjmckimmy crypto wallet.  *Id.* ¶ 10.  Before being able to complete these NFT purchases, Plaintiff would have been presented with the authentication requests and would have had to click the blue "Sign" button, thereby assenting to the December Terms.  *Id.* ¶¶ 8, 10.

Plaintiff also assented to the June Terms through OpenSea's mobile app.  When a user opens the mobile app for the first time, they are shown the following screen:



The screen states:  "[b]y continuing, you agree to OpenSea's **Privacy Policy** and **Terms of Service**[.]"  *Id.*  ¶ 11.  "Terms of Service" is bolded and contains a hyperlink to OpenSea's operative Terms.  *Id.*  Before they can use the app, users must select a button labeled "Continue," indicating their assent to these Terms.  *Id.*  Plaintiff first connected the crypto wallet associated with his tjmckimmy username to OpenSea's mobile app on December 1, 2021 and first connected his crypto wallet associated with his dextermoonshine username to OpenSea's mobile app on December 19, 2021.  *Id.* ¶ 12.  Prior to connecting these crypto wallets, he again assented to OpenSea's Terms by clicking the "Continue" button.  *Id.*

There is no reasonable dispute that Plaintiff assented to OpenSea's Terms.  Moreover, Plaintiff never opted out or rejected any aspect of OpenSea's Terms of Service.  *Id.* ¶ 4.

### C.   Plaintiff's Claims Against OpenSea and Refusal to Arbitrate

Plaintiff filed this Complaint against Defendant OpenSea on February 18, 2022, asserting causes of action for Negligence and Breach of Fiduciary Duty, Trust, Contract, and Implied Contract.  Complaint ¶¶ 20-26.  The gravamen of the Complaint is that Plaintiff's BAYC #3475 NFT was allegedly sold by an unknown third party without Plaintiff's authorization.  The Complaint claims that OpenSea was "aware of security vulnerabilities in its platform" yet "did not properly inform its users and did not timely put adequate safety measures in place."  *Id.* ¶ 7.  These alleged "vulnerabilities" purportedly "allowed an outside party to illegally enter through OpenSea's code and access Plaintiff's NFT wallet, in order to list and sell Plaintiff's Bored Ape at a literal fraction of the value (at .01 ETH)."  *Id.* ¶ 10.  The Complaint purports to seek damages of "over $1,000,000" and "injunctive relief requiring Defendant to pause and/or stop any listing or sale of the Bored Ape in question."  *Id.* ¶ 29.

While OpenSea denies these allegations and any liability, for the reasons explained below, the parties agreed that the merits of Plaintiff's claims should be decided in arbitration.  *See supra* Section IV.  Accordingly, on April 18, 2022, OpenSea sent Plaintiff a letter regarding Plaintiff's agreement to resolve any remaining claims in arbitration pursuant to OpenSea's Terms

of Service.  Melcher Declaration ¶ 2, Ex. 1.  This letter also notified Plaintiff that, in the event he would not voluntarily withdraw his case, Defendant would move to compel this entire dispute to arbitration.  *Id*.  The parties met and conferred on April 28, 2022 and were unable to resolve the issues underlying Defendant's Motion to Compel Arbitration.  *Id*. ¶ 3.  *Id*.

## III.    LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "[T]here is a strong presumption in favor of arbitration under the FAA."  *Grant v. Houser*, 469 F. App'x 310, 315 (5th Cir. 2012).  Courts "ordinarily resolve doubts concerning the scope of coverage of an arbitration clause in favor of arbitration."  *Hendricks v. UBS Fin. Servs.*, 546 F. App'x 514, 518 (5th Cir. 2013) (internal quotations and citations omitted).  Indeed, the FAA "reflect[s] [] a 'liberal policy favoring arbitration.'"  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

In ruling on a motion to compel arbitration, a court makes two determinations: (1) "whether there is a valid agreement to arbitrate" and (2) "whether the current dispute falls within the scope of a valid agreement."  *Edwards v. DoorDash, Inc.*, 888 F.3d 738, 743 (5th Cir. 2018).  However, if the court finds a valid agreement to arbitrate with a delegation clause, then "the role of the federal courts is strictly limited—we must refer the claim to arbitration absent some exceptional circumstance."  *See Kubala v. Supreme Prod. Servs.*, 830 F.3d 199, 202-203 (5th Cir. 2016).  Thus, once the Court determines that Plaintiff entered into an agreement to arbitrate, the parties' agreement delegates to the arbitrator issues of arbitrability.  *See PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 407 n.2 (2003); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002) (defining "gateway" questions of "arbitrability").

## IV.    PLAINTIFF AGREED TO ARBITRATE ALL CLAIMS AGAINST OPENSEA.

### A.    The Federal Arbitration Act Governs the Arbitration Agreements.

Both the express language of the Arbitration Agreements and the nature of this dispute

confirm that the FAA governs the Arbitration Agreements here.  The Arbitration Agreements expressly provide that the "[t]he Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement."  *See* June Terms at 13, § 15(c); December Terms at 14, § 16.  Thus, the parties intended the FAA to apply.  But even without that express language, the transactions covered by OpenSea's Arbitration Agreements, including this dispute, relate to interstate commerce.  *See* 9 U.S.C. § 2; *see also New Orleans Glass Co. v. Roy Anderson Corp.*, 632 F. App'x 166, 169 (5th Cir. 2015).  Courts have held that transactions involving the use of the Internet meet the "involving commerce" requirement.  *See, e.g.*, *Camilo v. Lyft, Inc.*, 384 F. Supp. 3d 435, 439 (S.D.N.Y. 2019).  Additionally, interstate commerce is involved because OpenSea is headquartered in New York and Plaintiff is a Texas resident.  *See* Complaint ¶¶ 3-4.

### B.      Plaintiff Agreed to Arbitrate with OpenSea.

Plaintiff most recently agreed to the December Terms, which provide that the Terms and "access to and use of the Service" should be enforced in accordance with New York law. December Terms at 15, § 17.  OpenSea is also headquartered in New York.  *See* Complaint ¶ 4; Meader Decl. ¶ 2.  Accordingly, New York contract law applies here.  But regardless of whether the Court applies New York, California, or Texas law, Plaintiff agreed to OpenSea's Terms and the Arbitration Agreements therein when he repeatedly purchased NFTs, connected his crypto wallets to OpenSea, and signed in to OpenSea's mobile app.  Meader Decl. ¶¶ 6-12.

Federal courts "apply ordinary state-law principles that govern the formation of contracts" to determine whether an agreement to arbitrate exists between the parties.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Under the choice-of-law rules of Texas, the forum state, "contractual choice of law provisions should generally be enforced." *Int'l Interests, L.P. v. Hardy*, 448 F.3d 303, 306-07 (5th Cir. 2006).  New York contract law thus applies here.  "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound."  *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 47 (E.D.N.Y. 2017).  In the context of transactions on the internet, a user assents to

9

a contract when they "take[] some action demonstrating that they have at least constructive knowledge of the terms of the agreement, from which knowledge a court can infer acceptance." *Id.* "Courts applying New York law have consistently held that customers accept revised terms of their accounts by continuing to use their accounts after receiving the revised terms." *Id.* at 51.

Even if the Court were to apply California[8] or Texas law, the contract analysis is materially the same. In California, "actual notice" is not required; instead, "an offeree is bound by an arbitration clause if a reasonably prudent Internet consumer would be put on inquiry notice of the agreement's existence and contents." *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 483 (9th Cir. 2020). Likewise, in Texas, assent turns on "whether the party to be bound had reasonable notice of the terms at issue and whether the party manifested assent to those terms." *One Beacon Ins. Co. v. Crowley Marine Servs.*, 648 F.3d 258, 269 (5th Cir. 2011). Moreover, a party cannot "excuse himself from his obligation to have read the Terms." *Klebba v. Netgear, Inc.*, No. 1:18-CV-438-RP, 2019 U.S. Dist. LEXIS 17833, *12 (W.D. Tex. Feb. 5, 2019).

Internet contracts are fully enforceable and binding under New York, California, and Texas law. *See, e.g.*, *Dohrmann*, 823 F. App'x at 484; *Phillips v. Neutron Holdings, Inc.*, No. 3:18-CV-3382-S, 2019 U.S. Dist. LEXIS 171313, at *11 (N.D. Tex. Oct. 2, 2019); *Centrifugal Force, Inc. v. Softnet Commun., Inc.*, 2011 U.S. Dist. LEXIS 20536, at *19 (S.D.N.Y. Mar. 1, 2011) (collecting cases). With a "clickwrap" agreement, a user demonstrates "constructive knowledge" by "affirmatively click[ing] a box on [a] website acknowledging awareness of and agreement to the terms of [a contract] before . . . [being] allowed to proceed with further utilization of the website, thereby executing a 'clickwrap' agreement." *Whitt v. Prosper Funding LLC*, No. 1:15-cv-136-GHW, 2015 U.S. Dist. LEXIS 91413, at *9 (S.D.N.Y. July 14, 2015) (quotations and citation omitted). Whereas with a sign-in or sign-up wrap, a user assents by "click[ing] a 'Sign Up' or 'Sign In' button where nearby language informed them that clicking

---

[8] The June Terms provide for California choice-of-law. *See* June Terms at 15, § 16. But because Plaintiff agreed to the updated December Terms, New York contract law applies to this dispute. *See infra* at II.B.

the buttons would constitute accepting the terms of service." *Kai Peng*, 237 F. Supp. 3d at 48.

Courts uphold "clickwrap" and "sign-in wrap" agreements when a link to the terms is provided near the checkbox or "sign in" button, and the user is notified that purchasing or signing in constitutes acceptance of the terms and proceeds anyway. For instance, the court in *Fteja v. Facebook, Inc.* found the "sign-up" wrap agreement binding where "the Terms of Use require the user to click on 'Sign Up' to assent" and immediately below that button, "the consumer is prompted to examine terms of sale that are located somewhere else" via a link. 841 F. Supp. 2d 829, 835, 837, 839 (S.D.N.Y. 2012). And in *Phillips*, the court upheld the sign-in wrap agreement where users were notified underneath the two sign-up screen buttons that "by signing up, they confirm that they 'have read and agreed to [the] User Agreement & Terms of Service.'" 2019 U.S. Dist. LEXIS 171313, at *12 (applying Texas law). The court reasoned that the link to the agreement was "reasonably conspicuous" and was sufficient to put a "reasonably prudent smartphone user" on notice because the "sign-up screen is visible on one page" and the link to the agreement is "in close proximity" to the two sign-up buttons. *Id.* at *12-13.

Here, Plaintiff agreed to first the Arbitration Agreement in the June Terms and then the Arbitration Agreement in the updated December Terms through at least three different channels.

Purchase Acceptance Flow. Plaintiff first made purchases using OpenSea's services with his two crypto wallets associated with his tjmckimmy and dextermoonshine OpenSea accounts on December 3, 2021 and December 18, 2021, respectively. Meader Decl. ¶ 7. To complete each of these two purchases, Plaintiff affirmatively checked a box to "agree to OpenSea's Terms of Service[,]" with the checkbox and accompanying language appearing directly above the "Confirm checkout" button. *Id*. ¶¶ 6-7. The words "Terms of Service" were also shown in blue text to indicate that they contained a hyperlink to OpenSea's Terms, and Plaintiff had the opportunity to review the Terms before he completed the purchases. *Id*. Accordingly, Plaintiff was at least *twice* put on notice that, by proceeding with his purchases, he assented to the June Terms (in effect as of December 3 and 18, 2021) and the Arbitration Agreement therein.

Wallet Authentication Acceptance Flow. Plaintiff also repeatedly agreed to OpenSea's

Terms through the pop-up requests when connecting his MetaMask and Coinbase wallets, which were reset and generated at least every 24 hours. *Id.* ¶¶ 8-10. The pop-up includes two buttons, "Cancel" and "Sign[,]" and legibly notifies Plaintiff above these two buttons that by "[c]lick[ing] to sign in[,]" he thereby "accept[ed] the OpenSea Terms of Service[.]" *Id.* ¶ 8. The pop-up further includes a URL to the operative Terms, offering Plaintiff an opportunity to review them each time before he signed in. *Id.* Plaintiff was and continues to be an active OpenSea user to this day and, thus, has signed into OpenSea and agreed to the June and December Terms numerous times. *Id.* ¶¶ 9-10.

      <u>Mobile Application Acceptance Flow.</u> Before users can use OpenSea's mobile application, the landing screen notifies users that "[by] continuing, you agree to OpenSea's Privacy Policy and Terms of Service[.]" *Id.* ¶ 11. This language appeared directly above the "Continue" button. *Id.* In addition, the words "Terms of Service" are in bold font and contain a hyperlink to OpenSea's operative Terms. *Id.* Here, Plaintiff's dextermoonshine crypto wallet first connected to OpenSea's mobile app on December 19, 2021, whereas his tjmckimmy crypto wallet first connected to the app on December 1, 2021. *Id.* ¶ 12. Before both instances, Plaintiff assented to the June Terms by clicking the "Continue" button. *Id.*

      Plaintiff could have opted out of the Arbitration Agreement in the June Terms. June Terms at 14-15, § 15(g). He never did so. Meader Decl. ¶ 4. And under the June and December Terms, Plaintiff could "reject" any of OpenSea's "future material change to th[e] Arbitration Agreement" with 30-days' written notice. *See* June Terms at 15, § 15(j); December Terms at 15, § 16. Plaintiff never exercised this right either. Meader Decl. ¶ 4.[9]

      Thus, this Court should find that Plaintiff agreed to arbitrate any claims against OpenSea.

### C.    The Arbitration Agreements Delegate Gateway Questions to the Arbitrator.

      "[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,'" "so long as the

---

[9]  To grant OpenSea's motion to compel arbitration, the Court need not decide which Terms, June or December, apply here: both contain broad arbitration agreements and, as discussed below, both properly delegate "gateway" questions to the arbitrator. *See infra* Section IV.C.

delegation is clear and unmistakable." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69, 79 (2010). "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement . . . , and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* at 70. Where, as here, "the parties' contract delegates the arbitrability question to an arbitrator[;] a court may not override the contract" and "possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (holding that the lower court had no power to address questions of arbitrability given the delegation clause in arbitration agreement, even where party resisting arbitration asserts that claim of arbitration is "wholly groundless").

Here, the Arbitration Agreements provide "clear and unmistakable evidence" that Plaintiff and OpenSea intended an arbitrator, not a court, to decide arbitrability. The Arbitration Agreements expressly and broadly delegate gateway questions to an arbitrator. *See* December Terms at 13-15, § 16 ("The arbitrator shall have exclusive authority to (a) determine the scope and enforceability of this Arbitration Agreement and (b) resolve any dispute related to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement. . . ."); *see also* June Terms at 14, § 15(d) (same). In *Rent-A-Center*, the Supreme Court upheld as valid the express delegation clause, stating: "The Arbitrator . . . shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, [or] enforceability . . . of this Agreement." 561 U.S. 63 at 66, 71-72. The delegation provisions here are similar to (if not even broader and more robust than) the one in *Rent-A-Center* and are likewise enforceable.

Additionally, Plaintiff and OpenSea clearly and unmistakably agreed to delegate arbitrability questions to the arbitrator by expressly incorporating JAMS rules, which empower the arbitrator to decide issues of arbitrability. *See Miller v. Conocophillips Co.*, No. 4:20-CV-1634, 2021 U.S. Dist. LEXIS 169570, at *3 (S.D. Tex. Mar. 4, 2021) (Bennett, J.); *see also Revis v. Schwartz*, 140 N.Y.S.3d 68, 79 (N.Y. App. Div. 2020) (holding that where "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an

13

arbitrator") (citation omitted); *Brinkley v. Monterey Fin. Servs., Inc.*, 242 Cal. App. 4th 314, 354 (Ct. App. 2015). Both the June and December Terms here provide that the arbitration shall be conducted under JAMS's Streamlined Arbitration Rules or Comprehensive Arbitration Rules, depending on the amount at issue. *See* June Terms at 13, § 15(c); December Terms at 14, § 16. JAMS's Streamlined Rules and Comprehensive Rules both state that the arbitrator "has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." Streamlined Arbitration Rules, Rule 8(b); Comprehensive Arbitration Rules, Rule 11(b).

Accordingly, any disputes regarding arbitrability must be resolved by the arbitrator.

**D.    Plaintiff's Claims Fall Squarely Within the Scope of the Arbitration Agreements and the Agreements Are Enforceable.**

1.    The Arbitration Agreements encompass this dispute.

Because the parties clearly and unmistakably delegated "gateway" questions to the arbitrator, the Court need not decide questions of arbitrability. *See Henry Schein*, 139 S. Ct. at 529. In any event, Plaintiff cannot carry his heavy burden to show that his claims fall outside the broad scope of the Arbitration Agreements. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000) (under the FAA and federal policy in favor of arbitration, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration") (citation omitted).

Courts distinguish between "narrow" and "broad" arbitration clauses. *See Pennzoil Expl. & Prod. Co. v. Ramco Energy*, 139 F.3d 1061, 1067 (5th Cir. 1998); *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 225 (2d Cir. 2001). "[V]ery expansive language will generally suggest a broad arbitration clause," *Louis Dreyfus*, 252 F.3d at 225, and courts have found that certain language—such as "related to," "relating to," or "any dispute"— indicates a broad arbitration clause. *See, e.g., id.*; *see also Halliburton Energy Servs. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 537 (5th Cir. 2019) (holding an arbitration clause providing that "any and all claims . . . related to" an issue "must be submitted to binding arbitration" is "broad and capable of expansive reach"); *Hopkins & Carley, ALC v. Thomson*

14

*Elite*, No. 10-CV-05806-LHK, 2011 U.S. Dist. LEXIS 38396, at *14 (N.D. Cal. Apr. 6, 2011). Additionally, the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, (1983); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625-26 (1985) (claims fall within the scope of broadly defined arbitration provisions if they merely "touch" the matters covered).

OpenSea's Arbitration Agreements apply to "***any dispute, controversy, or claim relating in any way***" to users' access of, use of, sale or distribution through, or "any aspect of [their] relationship with" OpenSea. December Terms at 14, § 16 (emphasis added); *see also* June Terms at 13, § 15(b). In other words, the Arbitration Agreements are "broad" because they "embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Pennzoil*, 139 F.3d at 1067. And in Plaintiff's own words, this dispute concerns the alleged "'purchase' or 'sale' of Plaintiff's Bored Ape" using OpenSea's services. *See* Complaint ¶¶ 10-13. Consequently, the Arbitration Agreements encompass Plaintiff's claims in this case.

### 2. The Arbitration Agreements are not unconscionable.

The Arbitration Agreements are not unconscionable under New York, Texas, and California law. Unconscionability includes two aspects: (1) procedural unconscionability and (2) substantive unconscionability. *See Carter v. Countrywide Credit Indus.*, 362 F.3d 294, 301 (5th Cir. 2004) (applying Texas law); *see also Tompkins v. 23andMe, Inc.*, 834 F.3d 1019, 1025 (9th Cir. 2016) (applying California law); *Isaacs v. OCE Bus. Servs.*, 968 F. Supp. 2d 564, 569 (S.D.N.Y. 2013) (applying New York law). "The burden of proving unconscionability rests on the party seeking to invalidate the arbitration agreement." *Carter*, 362 F.3d at 301; *see also Tompkins*, 834 F.3d at 1025; *Isaacs*, 968 F. Supp. 2d at 569. Plaintiff cannot meet his burden.

The Arbitration Agreements are not procedurally unconscionable. Procedural unconscionability concerns "the contract formation process and the alleged lack of meaningful

choice." *Ragone v. Atl. Video*, 595 F.3d 115, 121-22 (2d Cir. 2010) (applying New York law); *see also Zorilla v. Uber Techs., Inc.*, No. 4:16-CV-615, 2017 U.S. Dist. LEXIS 150487, at *15 (S.D. Tex. Mar. 16, 2017) (Bennett, J.). The mere fact that a consumer contract is standardized does not render it procedurally unconscionable. *Concepcion*, 563 U.S. at 346-47 (enforcing arbitration provision in an adhesion contract, noting "the times in which consumer contracts were anything other than adhesive are long past"); *see also Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 264 (E.D.N.Y. 2019) (granting motion to compel arbitration). The availability of market alternatives—as there are for services like those offered by OpenSea, particularly because transactions occur on a public blockchain available to all—also undercuts any claim of procedural unconscionability. *See Brower v. Gateway 2000*, 246 A.D.2d 246, 252 (N.Y. App. Div. 1998) ("the consumer is not in a 'take it or leave it' position at all; if any term of the agreement is unacceptable to the consumer, he or she can easily buy a competitor's product instead"); *Brookdale Inn & Spa v. Certain Underwriters at Lloyds, London*, No. 5:13-CV-02559-EJD, 2014 U.S. Dist. LEXIS 4008, at *9 (N.D. Cal. Jan. 13, 2014). Moreover, courts generally consider "an opt-out provision [] an important, if not dispositive, factor in rejecting challenges of procedural unconscionability." *Kai Peng*, 237 F. Supp. 3d at 55; *see also Zorilla*, 2017 U.S. Dist. LEXIS 150487, at *18 (finding arbitration agreement not procedurally unconscionable; plaintiffs "were under no pressure or obligation to even enter the arbitration agreement because [it] contained an Opt-Out clause"); *Alvarez v. T-Mobile USA, Inc.*, No. 2:10-CV-2373-WBS, 2011 U.S. Dist. LEXIS 146757, at *18-19 (E.D. Cal. Dec. 20, 2011) (finding no procedural unconscionability where the consumer was given "the opportunity to opt-out of the arbitration clause without suffering any adverse consequences").

Here, Plaintiff had a meaningful opportunity to review and understand the Terms before accepting them. The June Terms Arbitration Agreement even offered Plaintiff the opportunity to opt out by sending written notice to OpenSea within thirty days. *See* June Terms at 14-15, § 15(g). Plaintiff was also never in a "take-it-or-leave-it" position, as he could have simply used a competing service if OpenSea's Terms were unacceptable to him. *See Brower*, 246 A.D.2d at

16

252; *Brookdale*, 2014 U.S. Dist. LEXIS 4008, at *9.  Or better yet, Plaintiff could reject "any future material change" made by OpenSea to the Arbitration Agreements within the specified 30-day window.  *See* June Terms at 15, § 15(j); December Terms at 15, § 16.

    The Arbitration Agreements are also not substantively unconscionable.  Substantive unconscionability looks to the content or "fairness of the arbitration provision itself."  *Zorilla*, 2017 U.S. Dist. LEXIS 150487, at *15.  A substantively unconscionable contract is "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforc[ea]ble according to its literal terms."  *Gillman v. Chase Manhattan Bank*, 534 N.E.2d 824, 828 (N.Y. 1988); *see also Sanchez v. Valencia Holding Co.*, 353 P.3d 741, 748 (Cal. 2015).  The Arbitration Agreements are none of these things.  It provides that both OpenSea and its users agree to waive their "RIGHTS TO SUE IN COURT" and are "electing that all claims and disputes [] be resolved by arbitration."  *See* June Terms at 14, § 15(e); December Terms at 15, § 16.  OpenSea also agrees to pay all arbitration fees upfront if a user "cannot afford to pay" and to reimburse JAMS fees for claims less than $10,000, unless the arbitrator determines the claims are frivolous.  *See* June Terms at 13-14, § 15(c); December Terms at 14, § 16.  OpenSea users may also choose how the arbitration should be conducted (e.g., by phone, written submissions, etc.).  *See* June Terms at 13-14, § 15(c); December Terms at 14, § 16.  Plaintiff cannot show that these provisions do not compare favorably to court proceedings, where users might be required to pay their own fees and may be compelled to testify.  *See, e.g.*, *Kai Peng*, 237 F. Supp. 3d at 57 (E.D.N.Y. 2017); *see Zorilla*, 2017 U.S. Dist. LEXIS 150487, at *16 (holding that "[a] party seeking to invalidate an arbitration agreement bears the burden of showing the likelihood" of "large" and "prohibitive" arbitration costs).  Even if the Court finds that some portion of the Arbitration Agreements is substantively unconscionable (none is), the "appropriate remedy" is to "sever the improper provision of the arbitration agreement, rather than void the entire agreement."  *Ragone*, 595 F.3d at 124-25; *see also Shipman Agency, Inc. v. TheBlaze Inc.*, 315 F. Supp. 3d 967, 975 (S.D. Tex. 2018).

    Accordingly, the Arbitration Agreements are neither procedurally nor substantively

unconscionable and should be enforced.

## V.     CONCLUSION

Under the FAA, once the Court determines that Plaintiff's claims are referable to
arbitration, it must, at a minimum, stay proceedings.  9 U.S.C. § 3.  In the alternative, Section 3
does not limit the Court's authority to dismiss the action.  *See, e.g.*, *Alford v. Dean Witter
Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) ("[t]he weight of authority clearly supports
dismissal of the case when all of the issues raised in the district court must be submitted to
arbitration.").  Indeed, this Court has previously dismissed cases in their entirety with prejudice
where all issues in dispute are arbitrable.  *See, e.g.*, *Spivey v. Integrity Inspection Servs.*, No.
4:20-CV-1912, 2021 U.S. Dist. LEXIS 179111, at *7 (S.D. Tex. Mar. 4, 2021) (Bennett, J.);
*Machesky v. United Recovery Sys., LP*, No. 4:16-CV-596, 2016 U.S. Dist. LEXIS 179520, at *4
(S.D. Tex. Dec. 23, 2016) (Bennett, J.).

Accordingly, OpenSea respectfully asks this Court to compel Plaintiff's claims to
arbitration and dismiss the Complaint.

Dated:  May 2, 2022

Of Counsel:
Eric Ball (admitted *pro hac vice*)
Cal. Bar No. 241327
801 California Street
Mountain View, CA 94041

Molly R. Melcher (admitted *pro hac vice*)
Cal. Bar No. 272950
555 California Street, 12th Floor
San Francisco, CA 94104

Geoffrey R. Miller
Tex. Bar No. 24094847
S.D. Tex. Bar No. 3365078
902 Broadway, Suite 14
New York, NY 10010

Respectfully submitted,

FENWICK & WEST LLP

By:  */s/ Rodger R. Cole*
      Rodger R. Cole (admitted *pro hac vice*)
      Cal. Bar No. 178865
      801 California Street
      Mountain View, CA 94041
      Tel.: (650) 988-8500
      rcole@fenwick.com

*Attorney-in-Charge for Defendant OpenSea*

## CERTIFICATE OF CONFERENCE

I hereby certify that on April 28, 2022, counsel for Defendant OpenSea conferred with Plaintiff's counsel regarding OpenSea's intention to file the foregoing Motion to Compel Arbitration and Dismiss Plaintiff's Complaint.  The parties were unable to resolve the issues underlying this motion.

*/s/ Rodger R. Cole*
Rodger R. Cole

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed and served electronically through the Court's ECF System on all parties of interest in compliance with Federal Rule of Civil Procedure 5(b) and Local Rule 5.3 on May 2, 2022.

*/s/ Rodger R. Cole*
Rodger R. Cole