IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TIMOTHY MCKIMMY<br>*Plaintiff*, | §<br>§<br>§ | |
| V. | § | CIVIL ACTION NO. 4:22-cv-00545 |
| | § | |
| OPENSEA | § | |
| *Defendant.* | § | **JURY TRIAL DEMANDED** |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND MOTION TO DISMISS**

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Timothy McKimmy files this Response to Defendant's Motion to Compel Arbitration and Motion to Dismiss, and respectfully shows this Court the following:

**BACKGROUND**

Defendant Ozone Networks, Inc. d/b/a OpenSea ("Defendant" or "OpenSea") owns and operates the world's first and largest digital marketplace for crypto collectibles and non-fungible tokens (NFTs). Defendant has a $13.3 billion valuation.[1] Defendant recently hit a record $5 billion in monthly sales.[2] Defendant collects 2.5% on every transaction on its marketplace, amounting to approximately $125 million of revenue in January 2022 alone.[3]

Plaintiff Timothy McKimmy ("Plaintiff" or "McKimmy") is the rightful owner of Bored

---

[1] Techcrunch, "NFT kingpin OpenSea lands monster $13.3B valuation in new raise," available at: https://techcrunch.com/2022/01/04/nft-kingpin-opensea-lands-13-3b-valuation-in-300m-raise-from-paradigm-and-coatue/
[2] CNBC, "How OpenSea cornered the $17 billion market for NFTs," available at: https://www.cnbc.com/2022/04/15/how-opensea-cornered-the-17-billion-market-for-nfts.html.
[3] Available at: https://support.opensea.io/hc/en-us/articles/1500011590241-What-are-Service-and-Creator-fees-

Ape Yacht Club's Bored Ape #3475 (the "NFT" or "Bored Ape"). McKimmy held this NFT in his MetaMask wallet, linked to his account with Defendant's OpenSea platform.

When a MetaMask wallet is linked to an OpenSea account, all contents of the wallet are viewable by any other member of OpenSea. OpenSea members can choose to list all, some, or none of their NFTs for sale. Members of OpenSea can still make offers on other members' unlisted NFTs. When an offer is made, a member can choose to accept, counter, or ignore the offer; a member does not, however, have the option to reject a bid. Bids stay pending until they expire.

Defendant's code contained security vulnerabilities known to Defendant, yet Defendant never addressed them, allowing third parties to enter in through the code and access users' accounts. Defendant was on notice since late 2021 that the vulnerabilities could allow hackers to access other members' accounts and accept bids without the consent of the rightful owner of the NFT. On or about February 7, 2022, McKimmy's Bored Ape NFT sold for .01 ETH, which at the time equated to approximately $30. McKimmy did not authorize this sale.

McKimmy's NFT was ranked in the top 14% in rarity of all Bored Ape NFTs. The NFT has undisputable value. Just prior to the theft of McKimmy's Bored Ape NFT, Justin Bieber, for example, purchased a Bored Ape NFT for $1.2 million; that NFT was ranked in the top 40% in rarity, or approximately three times less rare than McKimmy's. McKimmy immediately filed a ticket with Defendant to alert them of the situation. McKimmy subsequently filed several other tickets, all which have been unanswered to date by Defendant.

After obtaining McKimmy's Bored Ape NFT, the hacker resold the Ape for approximately $600,000. Defendant inexplicably has decided to not suspend or freeze the account possessing the stolen Bored Ape NFT, leaving it open to further transactions.

    **A. Defendant must establish the parties' clear, explicit and unequivocal agreement to arbitrate.**

Defendant has claimed that there is a strong presumption in favor of arbitration, while ignoring it has the initial burden to demonstrate the parties made a valid agreement to arbitrate. In fact, in the entirety of its 21-page Motion, Defendant did not acknowledge its burden even *once.*

"The burden of establishing an arbitration agreement's existence is evidentiary and runs with the party seeking to compel arbitration." *United Rentals, Inc. v. Smith*, 445 S.W.3d 808, 812 (Tex. App.—El Paso 2014, no pet.). "Motions to compel arbitration are ordinarily decided in summary proceedings 'on the basis of affidavits, pleadings, discovery, and stipulations.'" *Kmart Stores of Texas, LLC v. Ramirez,* 510 S.W.3d 559, 565 (Tex. App.—El Paso 2016).

"It is well settled that '[a] party to an agreement may not be compelled to arbitrate its dispute with another unless the evidence establishes the parties' clear, explicit and unequivocal agreement to arbitrate.'" *Scotti v. Tough Mudder Inc.*, 63 Misc. 3d 843 (N.Y. 2019) (citation omitted). "When one party seeks to compel the other to arbitrate any disputes between them, the court must first determine whether the parties made a valid arbitration agreement," and the burden to demonstrate such is on the moving party. *Id.* The court "must draw all inferences in favor of the non-moving party." *Id.*

    **B. McKimmy did not agree to Defendant's arbitration clause.**

McKimmy is a resident of Texas, signed up for Defendant's platform in Texas, purchased the NFT while in Texas, and was in Texas when the security vulnerabilities in Defendant's platform allowed the theft of the NFT. Defendant concluded that New York law applies in this case, but cited to both New York and Texas cases in its Motion. Accordingly, while he believes Texas law should apply, McKimmy's Response addresses both. Whether under New York or Texas law, the Court should deny Defendant's Motion for the reasons herein.

"When deciding whether the parties agreed to arbitrate a certain matter," courts generally "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Further, courts should not assume that the parties agreed to arbitrate unless there is "clea[r] and unmistakabl[e]" evidence that they did so. *AT&T Technologies, Inc. v. Communications Workers*, 475 U. S. 643, 649 (1986).

There is no signed arbitration agreement in this case. Defendant has contended McKimmy's access of the OpenSea platform binds him by the Terms of Service (which contains an arbitration provision), yet Defendant has failed to show it properly displayed the Terms of Use for McKimmy to read when McKimmy signed up for Defendant's platform.

For Defendant to strip away McKimmy's right to a jury trial, Defendant must demonstrate conclusively that McKimmy agreed to waive that right. McKimmy did not. Upon signing up and accessing Defendant's platform on his Desktop, McKimmy did not see a clickable link to the Terms of Service, and did not review the Terms of Service; simply put, he did not see the arbitration clause, and did not agree to it. *See* Exhibit 1, Affidavit of McKimmy. Not only were the Terms of Service not displayed, McKimmy attaches evidence to this response demonstrating instances in which the Terms of Use are not even clickable. *See* Exhibit 2, Affidavit of Jennifer Luna; *See* Exhibits 3, 4 and 5, Video Clips.

New York law places a high burden on the party compelling arbitration. "It is settled that a party will not be compelled to arbitrate and, thereby, to surrender the right to resort to the courts, absent 'evidence which **affirmatively establishes that the parties expressly agreed to arbitrate their disputes**.'" *Waldron v. Goddess*, 61 N.Y.2d 181, 183 (1984) (citation omitted) (emphasis added). "The agreement must be clear, explicit and unequivocal and must not depend upon implication or subtlety." *Id.* (citation omitted). The Court found that with "there being no clear

commitment obligating the parties to compulsory arbitration" that the motion to stay arbitration should be granted, and that the motion to compel arbitration should be denied. *Id.* at 186. Akin to the situation here, the Court found that "the mere continuation of her employment did not operate to extend the arbitration agreement." *Id.* at 185. Similarly, here, McKimmy's accessing the OpenSea platform does not necessarily mean he agreed to the arbitration agreement contained in Defendant's Terms of Use. Here, Defendant has failed to affirmatively establish an agreement to arbitrate between McKimmy and Defendant.

McKimmy has attached three video clips with this Response.[4] Two of the video clips demonstrate that, when either accessing Defendant's site on a desktop (which is how McKimmy signed up with OpenSea, and through which he purchased the Bored Ape NFT in question) or on Defendant's site on a mobile phone, the following occurred:

- the Terms of Service do not pop up;
- the Terms of Service are not hyperlinked; and
- instead of stating "by signing in, you have accepted the Terms of Service" or some similar statement to the cases Defendant relies upon, it states "click to sign in and accept the OpenSea Terms of Service."

*See* Exhibits 3 and 4. Further, Defendant has claimed there are pop-up requests upon connecting a wallet. *See* Defendant's Motion, at p. 12. The third video clip demonstrates this is false; upon connecting a MetaMask wallet, there is no pop-up after the user presses "yes" and then "connect." *See* Exhibit 5.

---

[4] Plaintiff is emailing the full Response and accompanying Exhibits (including the video clips) to Defendant. Plaintiff will provide the video clips via physical, courtesy copy to the Court on a disc.





There are four general types of online consumer contracts: (1) browsewrap; (2) clickwrap; (3) scrollwrap; and (4) sign-in-wrap. *Harrison v. Rebel*, 2022 WL 356988 at *9 (N.Y. Sup.).

Browsewrap exists where the online host dictates that assent is given merely by using the site. Clickwrap refers to the assent process by which a user must click `I agree,' but not necessarily view the contract to which she is assenting. Scrollwrap requires users to

>physically scroll through an internet agreement and click on a separate `I agree' button in order to assent to the terms and conditions of the host website. Sign-in-wrap couples assent to the terms of a website with signing up for use of the site's services.

*Id.* (citing *Berkson v. Gogo LLC*, 97 F. Supp 3d 359, 394-95 (E.D.N.Y. 2015). The Court noted "regardless of the nomenclature, the classification of an online agreement does not conclude the inquiry, nor does the fact a consumer may have clicked a box." *Id.* (citation omitted). "Clarity and conspicuousness of arbitration terms are important in security informed assent," and "whether a plaintiff has inquiry notice of the terms in electronic agreements is a fact-intensive inquiry." *Id.*

Notably, Defendant does not discuss browsewrap or scrollwrap agreements in its Motion. By omitting any mention of browsewrap agreements, Defendant conceded any potential argument that McKimmy gave assent to the arbitration agreement by merely using the platform or site.[5] Similarly, by not discussing scrollwrap agreements, Defendant also conceded any potential argument that it showed the agreement on the page. Defendant only references "clickwrap" and "sign-in wrap" in its Motion. Defendant's Motion states generally:

>Courts uphold "clickwrap" and "sign-in wrap" agreements when a link to the terms is provided near the checkbox or "sign in" button, and the user is notified that purchasing or signing in constitutes acceptance of the terms and proceeds anyway.

Defendant's Motion, p. 11 (emphasis added). What Defendant fails to mention is that, in all three of the cases it relies upon for this premise, the link was *a clickable hyperlink*.

- In *Whitt*, in order to complete a loan application on Defendant Prosper's website, the following had to occur: (1) the plaintiff "was required to click a box adjacent to the bolded text 'Clicking the box below constitutes your acceptance of … the

---

[5] Plaintiff anticipates a potential argument by Defendant at any potential hearing that the mere use of the platform by Plaintiff constituted an agreement to be bound by the Terms of Service, and the arbitration clause. This would be a browsewrap agreement, yet is not discussed even once in Defendant's Motion. As such, for Defendant to argue such would be improper.

borrower registration agreement; and (2) "the term 'borrower registration agreement' was **conspicuously rendered as a hyperlink** to the Agreement itself." *Whitt v. Propser Funding LLC*, No. 1:15-cv-136-GHW, 2015 U.S. Dist. LEXIS 91313, at *6 (emphasis added). Importantly, the actual terms were "conspicuously rendered as a hyperlink to the Agreement itself." *Id.* Here, the Terms of Service were not clickable, and Plaintiff was not required to read the Terms of Service before proceeding with use of Defendant's platform.

- In *Fteja*, below the sign-up button was the following sentence: "By Clicking Sign Up, you are indicating that you have read and agree to the Terms of Service." *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012). Importantly, the "Terms of Service" was hyperlinked, which "sends users who click on it directly to a new location." *Id.* at 835.

- In *Phillips*, there was a notice underneath the sign-up button that indicated: "[b]y singing up, I confirm that I am at least 18 years old, and that I have read and agreed to Lime's User Agreement & Terms of Service." *Phillips v. Neutron Holdings, Inc.,* No. 3:18-CV-3382-S, 2019 U.S. Dist. LEXIS 171313, at *2. Again, as in *Whitt* and *Fteja*, the User Agreement & Terms of Service were hyperlinked to the user agreement. *Id.*

Here, as set forth in Exhibit A to Plaintiff's Response, the OpenSea platform neither states "by signing in, you confirm you have agreed to the terms of service" nor "by signing in, you confirm you have accepted the terms of service." Instead, the platform states: "Click to sign in and accept the OpenSea Terms of Service." The Terms of Service were not, and are not, hyperlinked on the sign-in page on Defendant's site. Further, after an individual signs in, the

Terms of Service do not pop up. Thus, at three relevant periods in time (*e.g.* in the time period before McKimmy signed up, at the time McKimmy signed up, and immediately after McKimmy signed up, the Terms of Service were not displayed, and there was no hyperlink. Clickwrap agreements are those "in which website users typically click an 'I agree' box after being presented with a list of terms and conditions of use." *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366 (E.D.N.Y. 2009). Those terms were not properly presented here.

Again, Plaintiff did not agree to the Terms or Service because when he signed up on Defendant's platform, there were no readily available terms for the Plaintiff to read or accept. Under Texas law, the required elements for the formation of a valid contract include: (1) an offer; (2) acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Levetz v. Sutton*, 404 S.W.3d 798, 803 (Tex. App.—Dallas 2013, pet. denied); *Cessna Aircraft Co. v. Aircraft Network, L.L.C.*, 213 S.W.3d 455, 465 (Tex. App.—Dallas 2006, pet. denied).

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Tecore, Inc. v. AirWalk Commc'n, Inc.*, 418 S.W.3d 374, 379 (Tex. App.—Dallas 2013) (quoting *United Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). "Ordinary principles of contract law determine whether there is a valid agreement to arbitrate." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Defendant did not display or link to the Terms of Service prior to McKimmy signing up to use the platform. In fact, as the Exhibits to this Response establish, there are serious issues with Defendant's platform and site, and whether the Terms of Service are displayed, hyperlinked and/or clickable.

**C. If the Court were to find the Agreement was entered into, McKimmy contends such was unconscionable.**

Generally, a court may not enforce an arbitration agreement if the Court finds the agreement was unconscionable when made. TEX. CIV. PRAC. & REM CODE 171.022. "[T]he basic test for unconscionability is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *In re FirstMerit Bank*, 52 S.W.3d 749, 757 (Tex. 2001). Defendant's Terms of Service includes a section on Injunctive Relief.

> 20.   Injunctive Relief
>
> You agree that a breach of these Terms will cause irreparable injury to OpenSea for which monetary damages would not be an adequate remedy and OpenSea shall be entitled to equitable relief in addition to any remedies it may have hereunder or at law without a bond, other security, or proof of damages.

*See* Defendant's Terms of Service, attached as Exhibit 2 to Defendant's Motion, ¶ 20. Importantly, Defendant reserves its own ability to seek injunctive relief, as well as equitable relief, for any breach of the Terms of Service, yet now attempts to prevent a user such as McKimmy from seeking relief in the Courts. As set forth in Plaintiff's Original Complaint, Plaintiff seeks equitable and injunctive relief in this matter. See Plaintiff's Original Complaint, Dkt. No. 1., ¶ 29.

**D. Further, even if the Court were to find that the Arbitration Clause is valid, Defendant's Terms of Service still allow for certain claims to be litigated in the Courts.**

Defendant's Terms of Service set forth a scenario in which a user may still seek relief in the Courts, by stating: "you or OpenSea may seek injunctive or equitable relief in a court of proper jurisdiction if the claim relates to intellectual property infringement or other misuse of intellectual property rights." *See* Defendant's Terms of Service, attached as Exhibit 2 to Defendant's Motion,

¶ 16. The Terms of Service's list of prohibited activities include: us[ing] the Service to buy, sell, or transfer stolen items, fraudulently obtained items, items taken without authorization, and/or any other illegally obtained items; and infring[ing] or violat[ing] the intellectual property rights or any other rights of others. *See* Defendant's Terms of Service, attached as Exhibit 2 to Defendant's Motion, ¶ 6. Defendant failed to reverse the transaction, even after multiple reports by McKimmy regarding the theft. *See* Exhibit 1. Further, Defendant has refused to freeze the account that currently has the stolen NFT, and instead froze McKimmy's account. *Id.*

The purchase and possession of a Bored Ape NFT provides the owner "an unlimited, worldwide license to use, copy, and display the purchased Art for the purpose of creating derivative works based upon the Art."[6] Defendant's actions effectively took those intellectual property rights away from McKimmy. Defendant's continued actions (e.g. freezing McKimmy's account while allowing the account with the stolen NFT the ability to transact) allow for the infringing of McKimmy's rights and for the misuse of intellectual property rights that belong to him.

As discussed herein, the party seeking to compel arbitrations bears the burden to establish a valid and enforceable arbitration agreement between the parties whose scope includes the claims asserted. *In re Advance PCS Health L.P.*, 172 S.W.3d 603, 605 (Tex. 2005) (citing *Cantella & Co. v. Goodwin*, 924 S.W.2d 943, 944 (Tex. 1996) (per curiam)); *see also J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003) (stating that a party attempting to compel arbitration must first establish that the dispute in question falls within the scope of a valid arbitration agreement). Therefore, not only does Defendant have to show that McKimmy agreed to the arbitration clause, Defendant also has to demonstrate that McKimmy's claims fall within the scope of the arbitration clause. Defendant cannot conclusively demonstrate such, and its Motion must

---

[6] *See https://boredapeyachtclub.com/#/terms*, last accessed on May 23, 2022.

fail.

### E. The Court should allow McKimmy to conduct discovery.

A party opposing arbitration is entitled to pre-arbitration discovery on a defense, if and only if, he or she shows, or provides a colorable basis or reason to believe, that the discovery requested is material in establishing the defense. *In re Western Dairy Transport, L.L.C.*, 574 S.W.3d 537, 547 (2019). The Court may order the discovery to be "limited to information regarding the scope of an arbitration provision or other issues of arbitrability." *Id.*

McKimmy contends the Court should deny Defendant's Motion to Compel Arbitration outright. In the alternative, should the Court be inclined to grant Defendant's Motion, however, the Court should allow McKimmy to conduct limited discovery on the issues central to arbitrability, at a minimum. If limited, McKimmy's counsel would not seek to explore the merits of the case during such discovery requests and/or depositions. McKimmy's counsel would explore whether Defendant's own representatives have discussed the lack of visibility as to the arbitration clause, and the extent to which Defendant is aware the Terms of Service links are not clickable.

Defendant has definitive control over the platform, including whether to shut down, whether to freeze an account, or whether to suspend transactions. Yet, after McKimmy sent numerous reports to Defendant regarding the theft of the Bored Ape NFT, *Defendant did not lock the account that contained the stolen NFT.* *See* Exhibit 1. This would be less egregious if Defendant were to take the position that it does not have the ability to lock accounts. Defendant, however, instead locked McKimmy's account. *Id.* This is nonsensical. This allows for the stolen NFT to again be sold, and for the person possessing the stolen NFT to profit. Importantly, Defendant itself continued to profit from the transactions involving the stolen NFT, because it collects its fee on every transaction.

**CONCLUSION**

Defendant profits from each and every sale that occurs on its platform. This is important because Defendant has a clear incentive to not shut down its site, even temporarily, to fix security vulnerabilities. Defendant's actions allowed for, and led to, the theft of McKimmy's NFT.

In the same CNBC article that reported on Defendant's $5 billion monthly sales, Defendant's spokesperson said: "We prioritize the trust and safety of all people on OpenSea, and are working hard to make sure that creators, buyers, and sellers alike feel supported by our policies, tools, and service." These words ring hollow. Defendant has refused to properly compensate McKimmy for the loss of the NFT, or even bring about the return of the NFT to him.

Whether under Texas law or New York law, Defendant cannot prevail on this Motion. Taking away a plaintiff's right to a jury trial is no small matter. For Defendant to do so, Defendant must first meet its burden, which it has not. Should the Court be inclined to grant Defendant's Motion, however, this Court should require Defendant to participate in limited discovery, including allowing McKimmy to question a corporate representative with knowledge of facts as to McKimmy's account, and to explore Defendant's knowledge regarding the lack of clickable links and the non-display of the Terms of Service.

Finally, although Defendant's Motion is also titled "Motion to Dismiss," Defendant cites no authority within its Motion, and failed to even dedicate one sentence, prior to the Conclusion paragraph, on why the case should be dismissed, instead of stayed, even if the Motion were granted.

Plaintiff asks this Court to deny Defendant's Motion, and asks for any and all relief to which he may be entitled.

Respectfully submitted,

**DALY & BLACK, P.C.**

*/s/ Andrew Dao*
Andrew Dao
Federal I.D. No. 2368172
Texas Bar No. 24082895
2211 Norfolk St., Ste. 800
Houston, Texas 77098

(713) 655-1405
(713) 655-1587 (fax)
adao@dalyblack.com

*and*

**TADGHIGHI LAW GROUP**

Ash Tadghighi
State Bar No. 24090418
711 Reinicke St.
Houston, Texas 77007
Tel: (832) 930-1135
Fax: (713) 583-0095
ash@tadghighilaw.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

The undersigned certifies this document was filed electronically and served through the Court's ECF system on all parties, in compliance with the Federal Rules of Civil Procedure on May 23, 2022.

*/s/ Andrew Dao*
Andrew Dao